IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JERRY ADAMS, JERRY EDRINGTON, BEN GOMEZ and MICHAEL HICKS, on behalf of themselves and on behalf of all others similarly situated, | § § § § § § | Civil Action No. |
| PLAINTIFFS, | § § § | **CLASS ACTION COMPLAINT** |
| -against- | § § § | **JURY TRIAL DEMANDED** |
| STANFORD GROUP COMPANY, STANFORD FINANCIAL GROUP, STANFORD INTERNATIONAL BANK LTD., STANFORD HOLDINGS, INC., STANFORD CAPITAL MANAGEMENT, LLC, R. ALLEN STANFORD, JAMES DAVIS, LAURA PENDERGEST-HOLT, JAY COMEAUX and JASON GREEN, | § § § § § § § § § § § | |
| DEFENDANTS. | § | |

  Plaintiffs, Jerry Adams, Jerry Edrington, Ben Gomez, and Michael Hicks, on behalf of themselves and on behalf of all others similarly situated, as for their complaint against Defendants Stanford Group Company, Stanford Financial Group, Stanford International Bank, LTD., Stanford Holdings, Inc., Stanford Capital Management, LLC (collectively referred to as "Stanford"), R. Allen Stanford, James Davis, Laura Pendergest-Holt, Jay Comeaux and Jason Green (collectively referred to as "individual Defendants"), allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1. Stanford, and the individual Defendants, engaged or participated in the implementation of manipulative devices to falsely report investment returns to customers, made or participated in the making of false and misleading statements, and participated in a scheme to defraud, or a course of business that operated as a massive fraud or a deceit on its customers. Plaintiffs' claims include fraud based on misrepresentation in connection with the sale of securities in violation of the Securities Act of 1933 and the Securities Exchange Act of 1934. As a result of Defendants' wrongful conduct and scheme, thousands of investors placed millions of dollars into Stanford's managed portfolios, including the purchase of "depositor-secured" Certificates of Deposit, and have sustained significant financial losses.

2. This fraud was accomplished though the direction and active participation of the individual Defendants who knowingly violated Securities and Exchange Commission ("SEC") and FINRA regulatory provisions, and federal securities law. When certain employees of Stanford complained about discrepancies in certain investment results, Stanford, through its officers and directors (including the individual Defendants), knowingly attempted to "cover up" this information, opting instead to hide and obstruct the truth, and Stanford's duty of compliance with regulatory and statutory law, and its fiduciary duty of full and fair disclosure to its customers.

3. On or about February 17, 2009, the SEC filed its complaint in the United States District Court, Northern District, in Dallas, Texas, No. 3-09CV0298, alleging, *inter alia*, a myriad of false and misleading practices by Stanford and its individual officers and control persons, in violation of federal securities law. In response to the SEC's Application for Emergency Relief, the Honorable Reed O'Connor issued a Temporary Restraining Order

enjoining further violation of federal securities law, freezing the assets of the certain Defendants, ordering the return of assets outside the United States to the jurisdiction of the federal court, and appointing a Receiver to marshal the assets of certain Defendants.

## JURISDICTION AND VENUE

4. The investments offered and sold by Stanford are "securities" under Section 2(1) of the Securities Act of 1933[15 U.S.C. § 77b], and Section 3(a)(10) of the Securities Exchange Act of 1934[15 U.S.C. § 78c].

5. This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act of 1933[15 U.S.C. § 77v(a)], and Section 27 of the Securities Exchange Act of 1934[15 U.S.C. § 78a].

6. Venue is proper pursuant to 28 U.S.C. § 1391(b) because the world headquarters of Stanford is located in Houston, Harris County, Texas. Further, a substantial part of the events giving rise to this claim, including solicitation of many individuals who became victims of Defendants' wrongful conduct occurred in the Southern District of Texas. Moreover, Defendants have, directly or indirectly, made use of the means or instruments of transportation and communication, and the means or instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein. A significant number of the transactions, acts, practices, and courses of business occurred in Stanford's world headquarters located in Houston, Texas.

## PARTIES

**A. Plaintiffs**

7. Plaintiff, Jerry Adams, is an individual residing near Stillwell, Cherokee County, Oklahoma.

8. Plaintiff, Milton Jerald Edrington, is an individual residing in Houston, Harris County, Texas.

9. Plaintiff, Ben Gomez, is an individual residing in Houston, Harris County, Texas.

10. Plaintiff, Michael Hicks, is an individual residing in Wimberley, Hays County, Texas.

**B.    Defendants**

11. Defendant, Stanford Group Company ("SGC"), a Texas-based corporation registered with the SEC as a broker-dealer and investment adviser, has 29 affiliated offices. SGC's principal business consists of sales of securities issued by Stanford International Bank Ltd. ("SIB"), and marketed as certificates of deposit. SGC can be served with process at its principal place of business at 5050 Westheimer, Harris County, Texas.

12. Stanford Financial Group ("SFG") is a Florida corporation doing business in Texas. SFG can be served with process at its principal place of business at 5051 Westheimer, Harris County, Texas.

13. SIB, which is wholly owned by Defendant R. Allen Stanford purports to be a private international bank domiciled in St. John's, Antigua, West Indies. SIB does business in the State of Texas through its related Stanford entities, and can be served with process at 5051 Westheimer, Harris County, Texas.

14. Stanford Holdings, Inc. can be served with process at its principal place of business at 5050 Westheimer, Harris County, Texas.

15. Stanford Capital Management, LLC, a registered investment adviser, can be served with process at its principal place of business at 5050 Westheimer, Harris County, Texas.

16. R. Allen Stanford, a U.S. citizen, is the Chairman of the Board and sole shareholder of SIB and the sole director of SGC's parent company. R. Allen Stanford can be served with process at his principal place of business at 5050 Westheimer, Harris County, Texas.

17. James M. Davis, a U.S. citizen and resident of Baldwin, Mississippi who offices in Memphis, Tennessee and Tupelo, Mississippi, is a director and chief financial officer of SFG and SIB. James M. Davis can be served with process at his principal place of business at 5050 Westheimer, Harris County, Texas.

18. Laura Pendergest-Holt, is the Chief Investment Officer of SIB and its affiliate Stanford Financial Group. Laura Pendergest-Holt can be served with process at her principal place of business at 5050 Westheimer, Harris County, Texas.

19. Jay Comeaux is a director and Chief of Compliance for SGC. Jay Comeaux can be served with process at his principal place of business at 5050 Westheimer, Harris County, Texas.

20. Jason Green is the President of the Private Client Group of SGC. Jason Green can be served with process at his principal place of business at 5050 Westheimer, Harris County, Texas.

**STATEMENT OF FACTS AND ALLEGATIONS**
**RELEVANT TO ALL CAUSES OF ACTION**

A. **The Organization**

21. Stanford is composed of the above named U.S. companies and its flagship entity, an offshore bank known as Stanford International Bank, Ltd. ("SIB"). All of these companies are controlled by R. Allen Stanford, who is either the founder, chairman, and/or chief executive officer of all related Stanford companies.

22. R. Allen Stanford, 58, is a Texas billionaire with a reported net worth, according to Forbes, of an estimated $2.2 billion, making him the 205th on Forbes 2008 list of the richest people in the U.S. worldwide. He often refers to the meager beginnings of his father's insurance business in Mexia, Texas during the Depression, but he equally touts his prominent business and political influence in the twin island Caribbean nation of Antigua and Barbuda, where he was knighted as Sir Allen in 2006, and where his Antiguan-based offshore bank is located.

23. With reported assets of $1 billion in 2001, SIB now has more than $8.5 billion in total assets, according to the bank's report in December 2008. To do so, R. Allen Stanford and his key management engaged in a campaign to substantially increase SIB assets in Antigua by selling high-yield certificates of deposits to affluent U.S. investors through Stanford's network of U.S. companies. U.S. investors are actively solicited to purchase SIB-issued CDs through his array of affiliated companies. Stanford Group Company is owned by Stanford Group Holdings, Inc., which is in turn owned by R. Allen Stanford. For all practical and legal reasons, all related companies are owned and controlled by R. Allen Stanford.

B. **The Stanford International Bank**

24. R. Allen Stanford has created a complex web of affiliated companies that exist and operate under the brand Stanford Financial Group ("SFG"). SFG is described as a privately-held group of companies that has in excess of $50 billion "under advisement."

25. SIB, one of SFG's affiliates, is a private, offshore bank that purports to have an independent Board of Directors, an Investment Committee, a Chief Investment Officer and a team of research analysts. While SIB may be domiciled in Antigua, a small group of SFG employees who maintain offices in Memphis, Tennessee, and Tupelo, Mississippi, purportedly monitor the assets.

26. SIB, an Antiguan bank charted under the laws of the sovereign nation of Antigua and Barbuda, boasts in its promotional literature that "deposit safety" is its "number one priority." Acting in concert with Stanford's U.S. based companies, the offshore bank taps into the lucrative U.S. investor market through the conduit of Stanford Group Companies ("SGC"), and its 29 affiliated offices throughout the U.S. In all cases, SGC aggressively pushed its advisors to sell the SIB CD's program and rewarded them handsomely for their success.

C. **SGC rushes to fill the SIB coffers**.

27. Among the platform of financial products offered by SGC, the sale of SIB CDs offered the greatest incentive to financial advisors. The campaign involved direct pressure on the financial advisors to sell the foreign CDs, coupled with bonus incentives for employees who could generate the greatest number of deposits. The program was aptly named as "The Contest." An "SIB Scoreboard" was kept, listing each group's performance in meeting their quota, which determined the size of bonus they would receive.

28. From a 3% referral fee payable to SGC on every SIB CD sold, SGC advisers received a 1% commission if they sold $2 million of SIB CDs in a quarter. They would also receive as much as a 1% trailing commission throughout the term of the CD if they maintained the $2 million per quarter production hurdle. This commission structure provided a powerful incentive for SGC financial advisers to aggressively sell CDs to the U.S. investors, and was used extensively to recruit new advisors to SGC.

29. SGC aggressively expanded its number of financial advisors in the United States. Through this expansion, SIB's network of representatives who sold CD products grew substantially. According to the Annual Report and information provided to advisors, the total assets at SIB grew exponentially from 2001 to 2008:

    1 Billion – July 2001
    2 Billion – July 2003 (2nd Billion in 24 months)
    3 Billion – December 2004 (3rd Billion in 17 months)
    4 Billion – December 2005 (4th Billion in 12 months)
    5 Billion – October 2006 (5th Billion in less than 10 months)

By the end of 2007, SIB sold $6.7 billion of CDs, and in its latest report of December 2008, SIB reports over 30,000 clients, representing $8.5 billion in total assets.

  30. SIB aggregated all funds from the sale of CDs, and purportedly reinvested those funds pursuant to an investment strategy monitored by a group of analysts in Memphis, Tennessee, who reported to senior investment officers. According to SIB's Annual Reports for 2005 and 2006, which were signed by R. Allen Stanford and James Davis, the bank invested customer deposits "in a well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements."

  31. SIB CD's are offered in three forms at varying terms: Fixed, Flex and Index Linked. Each CD offers a substantially higher rate of return compared to domestic certificates of deposit. For example, SIB offered 7.45% as of June 1, 2005, 7.878% as of March 20, 2006 for a fixed rate CD based on an investment of $100,000.

  32. SGC advisors who questioned how SIB could pay such high rates of return for CD's compared to U.S. banks were told that the bank's investment strategy had garnered consistently high investment returns on its portfolio. However, any attempts to discover the specifics of the investment portfolio were rebuffed, and advisors were summarily told that SIB could not disclose the details of its assets or portfolio managers, except to say that the assets were safe in a globally diversified portfolio that was capable of 90% liquidation within 48 hours.

  33. To allay advisors' concerns, and facilitate sale of the foreign CDs, senior management at SGC and SIB had to create the appearance of a stable, liquid, and secure CD,

comparable to the low risk associated with a familiar domestic CD. Advisors were deceived by senior management to make the following misrepresentations which operate as a fraud or a deceit on purchasers of the SIB CDs:

- CD is liquid, minimally leveraged, and can be redeemed at any time.

- SIB is strongly capitalized with R. Allen Stanford's own personal funds, and depositor security is the number one priority.

- The SIB investment portfolio was monitored by a team of analysts and consistently generates more investment return than is paid out in CD interest and expenses so that the principal is not really ever in jeopardy.

- The SIB CDs are secure because of insurance coverage from Lloyd's and other underwriters, and Excess FDIC.

- The SIB investment portfolio is overseen by a regulatory authority in Antigua, and an independent auditor who verified and audited financial statements of SIB.

34. These misrepresentations were false and misleading when made to customers who purchased the SIB CDs.

**D. SGC and SCM misrepresented performance results in its managed investment program.**

35. SGC/SCM induced clients, including non-accredited, retail investors, to invest in excess of $1 billion in its managed investment program called "Stanford Allocation Strategies" ("SAS") by touting its track record of "historical performance." SGC/SCM highlighted the purported SAS track record in thousands of client presentation books.

36. SGC/SCM used these impressive, but fictitious, performance results to grow the SAS program from less than $10 million in assets in 2004 to over $1 billion in 2008.

37. SGC/SCM also used the SAS track record to recruit financial advisors away from legitimate advisory firms who had significant books of business.

38. SGC/SCM told investors that SAS has positive returns for periods in which actual SAS clients lost substantial amounts. For example, in 2000, actual SAS client returns ranged

from negative 7.5% to positive 1.1%. In 2001, actual SAS client returns ranged from negative 10.7% to negative 2.1%. And, in 2002, actual SAS client returns ranged from negative 26.6% to negative 8.7%. These return figures are all gross of SCM advisory fees ranging from 1.5% to 2.75%. Thus, Stanford's claims of substantial market out performance were blatantly false (*e.g.*, a claimed return of 18.04% in 2000, when actual SAS investors lost as much *as* 7.5%).

39. SGC/SCM's management knew that the advertised SAS performance results were misleading and inflated. From the beginning, SCM management knew that the pre-2005 track record was purely hypothetical, bearing no relationship to actual trading. And, as early as November 2006, SGC/SCM investment advisors began to question why their actual clients were not receiving the returns advertised in pitch books.

40. In response to these questions, SGC/SCM hired an outside performance reporting expert, to review certain of its SAS performance results. In late 2006 and early 2007, the expert informed SGC/SCM that the performance results for the twelve months ended September 30, 2006 were inflated by as much as 3.4 percentage points. Moreover, the expert informed SGC/SCM managers that the inflated performance results included unexplained "bad math" that consistently inflated the SAS performance results over actual client performance. Finally, in March 2008, the expert informed SGC/SCM managers that the SAS performance results for 2005 were also inflated by as much as 3.25 percentage points.

41. Despite their knowledge of the inflated SAS returns, SGC/SCM management continued using the pre-2005 track record. In fact, in 2008 pitch books, they presented the back-tested pre-2005 performance data under the heading "Historical Performance" and "Manager Performance" along side the audited 2005 through 2008 figures.

42. Finally, SGC/SCM compounded the deceptive nature of the SAS track record by blending the back-tested performance with audited composite performance to create annualized 5 and 7 year performance figures that bore no relation to actual SAS client performance.

43. Other than the fees paid by SIB to SGC for the sale of the CD, SAS was the second most significant source of revenue for the firm. In 2007 and 2008, approximately $25 million in fees from the marketing of the SAS program.

## CLASS REPRESENTATIVE CLAIMS

44. Plaintiff Adams individually entrusted at least $600,000 to Stanford for investment on his behalf based upon materially false and misleading information disseminated by Defendants, to the effect that Stanford was a legitimate enterprise engaged in the lawful brokerage and sale of investment securities, with the purported rates of return on investment.

45. In determining to invest further monies, Adams naturally, reasonably, and justifiably relied upon Defendants' misrepresentations in deciding to make such investment.

46. As a consequence of Defendants' fraud as alleged here, Adams has been damaged in an amount to be proven at trial.

47. Plaintiff Edrington individually entrusted at least $400,000 to Stanford for investment on his behalf based upon materially false and misleading information disseminated by Defendants, to the effect that Stanford was a legitimate enterprise engaged in the lawful brokerage and sale of investment securities, with the purported rates of return on investment.

48. In determining to invest further monies, Edrington naturally, reasonably, and justifiably relied upon Defendants' misrepresentations in deciding to make such investment.

49. As a consequence of Defendants' fraud as alleged here, Edrington has been damaged in an amount to be proven at trial.

50. Plaintiff Gomez individually entrusted at least $250,000 to Stanford for investment on his behalf based upon materially false and misleading information disseminated by Defendants, to the effect that Stanford was a legitimate enterprise engaged in the lawful brokerage and sale of investment securities, with the purported rates of return on investment.

51. In determining to invest further monies, Plaintiff Gomez naturally, reasonably, and justifiably relied upon Defendants' misrepresentations in deciding to make such investment.

52. As a consequence of Defendants' fraud as alleged here, Plaintiff Gomez has been damaged in an amount to be proven at trial.

53. Plaintiff Hicks individually entrusted at least $500,000 to Stanford for investment on his behalf based upon materially false and misleading information disseminated by Defendants, to the effect that Stanford was a legitimate enterprise engaged in the lawful brokerage and sale of investment securities, with the purported rates of return on investment.

54. In determining to invest further monies, Hicks naturally, reasonably, and justifiably relied upon Defendants' misrepresentations in deciding to make such investment.

55. As a consequence of Defendants' fraud as alleged here, Plaintiff Hicks has been damaged in an amount to be proven at trial.

## CLASS ACTION ALLEGATIONS

56. Plaintiffs bring this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following:

   a. All persons and/or entities who purchased securities and CDs sold by or through Defendant Stanford, or other selling agents affiliated with Stanford, from as early as the January 1, 2000 until February 17, 2009 inclusive (the "Class Period"), excluding Defendants and all officers and directors of Defendants during the Class Period (the "Class").

b. Excluded from the Class are: (1) all persons or entities whose claims against Defendants with respect to securities purchased and invested by that person have been finally adjudicated, individually or on a classwide basis, in litigation or arbitration, before any court or arbitration tribunal; and, (2) all persons or entities who have entered into valid releases with Defendants covering all of the wrongs alleged in this Complaint. To the extent that any person has not had all of his claims with respect to securities purchased and invested in finally adjudicated or finally released, the Class includes said person(s), but only to the extent of unadjudicated and/or unreleased claims arising from damages suffered as a result of an investment in any of the Investments.

c. Also excluded from the Class are Defendants, members of the immediate family of any Defendant, and their legal representatives, heirs, successors or assigns.

d. The Class satisfies the requirements of Rule 23(a) and 23(b)(3), Federal Rules of Civil Procedure:

- *Numerosity.* During the Class Period, numerous different securities were sold to 30,000 or more individuals and/or entities. The number of the Class members is estimated to be in the thousands.

- *Typicality.* The losses to Plaintiffs were caused by the same events and courses of conduct that give rise to the claims of the other members of the Class.

- *Common Questions.* Among the questions of law and fact common to the Class are:

    (a) whether Defendants violated Section 10b and Rule 10b-5 of the Securities Exchange Act of 1934, 15 USC § 78a, fraudulently

inducing Plaintiffs and the Class to purchase investments marketed by Stanford through the use of materially false and misleading Monthly Account Statements, sales materials and oral presentations;

(b) whether Defendants violated the provisions of the Securities Exchange Act Section 10(b) and Rule 10b-5 by knowingly or with severe recklessness providing substantial assistance in connection with the violations of Securities Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] alleged herein;

(c) whether Defendants violated the provisions of the Securities Exchange Act Section 12 by knowingly or with severe recklessness communicating material misstatements and/or omissions that were disseminated by use of the means and instruments of transportation or communication in interstate commerce or of the mails; and

(d) whether Defendants violated the provisions of the Securities Exchange Act Section 17(a) by knowingly or with severe recklessness (a) employing devices, schemes or artifices to defraud; (b) obtaining money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c) engaging in transactions, practices or courses of business which operate or would operate as a fraud or deceit.

- *Adequate Representation.* The representative Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained experienced counsel qualified in class action litigation that are competent to assert Class members' interests.

- *Superiority.* A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual damages to any one investor may be relatively small, making the expense of non-class litigation prohibitive or impractical for Class members. Moreover, in light of the disclosures of the SEC, additional lawsuits are likely to be filed. An overall resolution is preferable to the result of inconsistent litigations dealing with individual investors.

## CAUSES OF ACTION
## FIRST CLAIM

## FIRST CLAIM FOR RELIEF
## (Violations of § 10(b) of the Securities Exchange Act and of Rule 10b-5)

57. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

58. As more fully set forth in the factual allegations above, Defendants, through the use of the mails and the means and instrumentalities of interstate commerce, fraudulently induced Plaintiffs and the Class to purchase investments, being marketed by Stanford through the use of materially false and misleading Monthly Account Statements, sales materials and oral presentations.

59. Defendants knowingly transmitted to Plaintiffs and the Class and disseminated, directly and through its agents, materially false and misleading statements, as more fully described above, describing and recommending the purchase of the securities purchased by Plaintiffs and the Class.

60. At the time of the misstatements and omissions described above, Defendants knew or should have known that such statements were materially false and misleading and omitted facts required in order to make the statements made, in light of the circumstances under which they were made, not misleading, but knowingly or recklessly made such statements to Plaintiffs and the Class in order to induce them to purchase the investments.

61. Plaintiffs and the Class reasonably relied upon the information provided to them and statements made by Stanford and its agents recommending the purchase of the securities. At the time of such investments, Plaintiffs and the Class had no knowledge that the information and recommendations provided by Defendants contained material misstatements and omissions.

62. Plaintiffs and the Class would not have purchased the securities but for the materially false and misleading information provided to them by Defendants.

63. As a result of their investments, Plaintiffs and the Class have been damaged and their original investment capital has been substantially depleted.

## SECOND CLAIM
## AS TO STANFORD, DAVIS, COMEAUX, PARRISH AND PENDERGEST-HOLT
### Aiding and Abetting Violations of Securities Exchange Act Section 10(b) and Rule 10b-5

64. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

65. In addition to violating the provisions of the Securities Exchange Act Section 10(b) and Rule 10b-5, Stanford, Davis, Pendergest-Holt, Comeaux, and Green, in the manner set

forth above, knowingly or with severe recklessness provided substantial assistance in connection with the violations of Securities Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 alleged herein.

66. For these reasons, Stanford, Davis, Pendergest-Holt, Comeaux, and Green aided and abetted violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5.

## THIRD CLAIM
### (Violations of Section 12 of the Securities Act)

67. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

68. Defendants sold the securities to Plaintiffs by means of oral and written communications, which contained material misstatements and/or omissions and were disseminated by use of the means and instruments of transportation or communication in interstate commerce or of the mails.

69. Plaintiffs and the Class, without knowledge of the falsity of Defendants' statements and of the material omissions in the written materials provided by Defendants including, but not limited to, Monthly Account Statements and other misrepresentations made by Defendants, as described above, and reasonably believing such statements to be true and complete, purchased investments from Defendants.

70. Plaintiffs and the Class would not have purchased the investments but for the materially false and misleading information provided to them by Defendants.

71. By virtue of the foregoing, Plaintiffs and the Class have been damaged and are entitled to damages and other relief for Defendants' violations of Section 12 of the Securities Act as alleged herein.

# FOURTH CLAIM
## Violations of Section 17(a) of the Securities Act

72. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

73. Defendants, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, have: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit.

74. As part of and in furtherance of this scheme, Defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material fact and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

75. Defendants made the referenced misrepresentations and omissions knowingly or grossly recklessly disregarding the truth.

76. For these reasons, Plaintiffs and the Class have been damaged, and are entitled to damages and other relief for Defendants' violation of Section 17(a) of the Securities Act as alleged herein..

# PLAINTIFFS DEMAND TRIAL BY JURY

**WHEREFORE,** Plaintiffs, on behalf of themselves and all others similarly situated, request the following procedural orders and demand judgment against Defendants, equitable relief and damages, as follows:

1. An order certifying the proposed class of investors, together with any necessary or appropriate subclasses, under Federal Rules of Civil Procedure Rule 23, and appointing Plaintiffs and their counsel to represent the Class;

2. Compensatory damages in an amount to be sufficient to compensate each Class member for their losses;

3. Consequential damages in an amount to be determined at trial;

4. Disgorgement and restitution of all earnings, profits, compensation and benefits received by Defendants as a result of their unlawful acts and practices;

5. Costs and disbursements of the action;

6. Reasonable attorneys' fees; and

7. Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

**MIKE O'BRIEN, P.C.**

By: /s/ *Mike O'Brien*
Mike O'Brien
State Bar No. 15170200
14355 Highway 105
Washington, TX 77880
Telephone: (713) 222-0088
Facsimile: (713) 222-0088


**FLEMING & ASSOCIATES, L.L.P.**

By: /s/ *George M. Fleming*
George M. Fleming
State Bar No. 07123000
Sylvia Davidow
State Bar No. 05430551
Chris Fonville
State Bar No. 24039310
1330 Post Oak Blvd., Suite 3030
Houston, TX 77056-3104
Telephone: (713) 621-7944
Facsimile: (713) 621-9638

**ATTORNEYS FOR PLAINTIFFS**